May I please the court? Good morning. Patrick Gorman, counsel for Appellants Aron and Kerry Margosian, present with me in court this morning is co-counsel Russell Van Roosboom. In this case, the district court erred in granting the land bank's motion for summary judgment on a loan guarantee. The magistrate judge stated that the Margosian's evidence created a dispute as to whether land bank acted deviously and perhaps dishonestly in getting the document signed. He called the court's assertion, close quotes, that land bank was less than honest in its circumstances of its representatives' visit to the Margosian home, how they presented the documents to the Margosians, and their representations concerning the purpose and effect of the documents being signed. Yet the magistrate judge barred all of this evidence under the parole evidence rule as espoused in Pendergrass and its progeny. After the order came down, the California Supreme Court decided the River Island case, clarifying the parole evidence rule, calling Pendergrass, quote, an aberration, close quotes, that was out of step with established California law. The parole evidence rule was never intended to be used as a shield to prevent the proof of fraud. We respectfully submit that the River Island case compels the reversal of the grant of summary judgment on the fraud claims and defenses in this case. Well, the River Island case does affect the parole evidence issue, but it doesn't affect the reliance question. No, it does not. No, it does not. And on the reliance question --" So it doesn't --" why does it compel reversal, then? Well, it prevails --" the reversal is necessary because that evidence now gets back in front of the court, all of it which has been excluded. With regard to the reliance issue --" But this was done on summary judgment, was it not? It was summary judgment. So why can't we just look at the reliance evidence ourselves? We can, de novo. And the district court --" yes, de novo. Yes. It's always de novo on summary judgment. And the district court also looked at the reliance separately. The district court looked at the reliance separately. So why don't we just go there? Okay. The district court essentially concluded that because the terms of the guarantee were directly contradicted by the oral representations of the land-backed representatives, that there could not be justifiable reliance. But isn't there always the problem that, you know, if you sign something that's, in this case, said, guarantee, that, I mean, can you just ignore what you're assigning? I mean, you don't have a claim. I'm sure I believe I would have seen it if there was, that they were holding their hands over the part that said, this is a guarantee, or the pages where he didn't check, there wasn't a thing checked saying that it could include your personal property. That's correct, Your Honor. We have no such claim. What we have in this case, Your Honor, are land-bank representatives showing up unannounced on a Friday afternoon. I understand. And in the span of less than 13 minutes from the time they call asking for final directions to the Margosian home, signatures start occurring on documents. Based upon the land-bank's evidence, there were at least four documents that they were asked to be signed, 45 pages in length. The guarantee alone was 8 pages in length. But it said on it, guarantee. It also said on it, on the second page, there's a box for personal liability. Yes, but it wasn't checked. It wasn't checked. But if it was checked, then the guarantee is entirely consistent. Well, no, that's not true. My understanding is that if it is checked, then there's no personal liability, but there could be corporate liability. That's right. And if it had been checked in this case and it wasn't checked, then what's the relevance of it? Well, the relevance of it is there's the Julius Castle Restaurant case is the first appellate district case that talks about what to look at as far as reliance in a post-River Island world. And it says one of the things to look at is, is there a compatibility between the oral representation and the document? In this case, there is. Had the document been that box been checked, the document is entirely consistent with the oral representation. You look at that, plus the other elements that were discussed in the Julius Castle case, in which it was appealed following a jury verdict finding for fraud in the inducement of a lease and a bulk sales agreement that had been negotiated over several weeks. Five to seven drafts had been circulated, and the plaintiffs said they didn't feel rushed when they signed them. In that case, the Court nevertheless found that there were substantial evidence supporting the jury's verdict. You contrast what happened in that case with what happened at the court. What is the – it seems to me there was somewhat shifting history in terms of what the Margosians claimed they were told. At some point, didn't they claim they were told that this was only a change of name or something, but they're not saying that anymore? No, no, no. They were told a couple things with – bear in mind, they're presented with five documents, at least four or five documents to sign on this unannounced visit. They were told one was a name change, one was a restructure agreement. And there was a discussion of guarantee, because as in the record, there is a lot of conversation from Kerry Margosian with Martha Hugger, the bank's representative, as to what a guarantee is and what is being guaranteed. So it wasn't just simply they were asked to sign a name change. And she says she read the documents, doesn't she? She said she attempted to read the documents. There's no – well, she didn't say she was prohibited from reading the documents. But again, you've got 45 pages of documents in a very short period of time, and representations being made as to what's in the documents. Land Bank's own internal e-mail stated that she was, I think it said, obviously or somewhat overwhelmed by the volume of the documents and that the notary, Martha Hugger, did an outstanding job getting her comfortable with them in order to get them signed. These were not unsophisticated – are not unsophisticated people, right? I mean, they had this multimillion-dollar farm. He was the treasurer or CFO of the company. Why – given what you're just saying, I mean, wouldn't the logical thing have been to say, okay, I'll go over it with our attorneys, we'll give it to our attorneys? Well, there is no evidence in the record that they were sophisticated parties. Erin Margosian has a high school education, has been a farmer all his life. Carrie Margosian has a college degree but never worked outside of the home for the first 23 years of her married life. So they weren't sophisticated parties in connection with the signing of legal documents. Erin was a farmer and a good farmer. That's the role that he played in the relationship with Martin Zininovich with regard to ZM, the packinghouse that we're here talking about today, and with regard to two ranches. Erin Margosian and his wife had no involvement whatsoever with the brokerage company, ZNS Distributing, which was the funding organization for all of these other entities, according to the land bank's documentation. So there was no evidence that they were sophisticated in the same context as the parties in the Julius Castle case that I just mentioned were sophisticated parties. Why would the bank have known that? Why would the bank be able to, among other things, take at their word that somebody says he's the CFO or treasurer of a company? Well, let me put it that way. That's a good point. And the district court or the magistrate judge noted that in his decision, that he thought that for the summa tomo claim, that land bank was justified in relying on Erin's signature over the term chief financial officer. Well, the way to address that is twofold. The credit analysis report that the bank prepared noted that there were two shareholders in this company. So in a two-shareholder company, you're going to have the shareholders essentially occupy all of the offices. That's number one. Number two, to the extent that land bank really had no reason to believe that the Margosians did not know everything, why then, when they have this unannounced visit to get these documents signed, is Rob Fruden, the senior loan officer, misrepresented as a trainee, so new to the bank that he doesn't even have a business card? If the bank truly had no reason to believe that the Margosians didn't know where all the bodies were buried, why not simply introduce him as, this is Rob Fruden, he's been involved with these loans since the beginning because he was, going back to 07, he authored the credit analysis report that contained all of the damning information about the financial situation of these entities, and came to the conclusion that the only purpose for the loans, only purpose for the loans, was to protect the bank and secure the bank because it had not been secured on the million-dollar line of credit. If the bank did not know, excuse me, had no reason to believe that the Margosians didn't know all this information, why not introduce Rob Fruden as who he was, saying he's here to answer all your questions, he's here to get your signatures on these documents? With regard to the next thing, that really folds into our argument on the Sumitomo claim because the Court found for the land bank on that issue as well on this second element, which we just talked about, they said the Court determined there was a tribal issue, a fact as to the other two elements. Finally, on the punitive damage aspect of it, we would respectfully submit that since the Farm Credit Amendments Act came down after Sparkman, there's been really no Ninth Circuit case on it. Ginsburg. Ginsburg. It's what came down, sorry? The Farm Credit Act, Credits Amendment Act, in 1985, passed after Sparkman was decided in 1983, which significantly deregulated the government's involvement in production credit associations and land banks. We respectfully submit that in a post-Farm Credits Amendments Act scenario that the test that the district court should have applied before determining whether or not land bank was immune from punitive damages was the FDIC v. Meyer test. And if the land bank, and it's their obligation to make the showing, if the land bank can make the showing on one of those three elements, then they are immune. Otherwise, they've waived it by electing to be sued by being able to sue and be sued. And unless the Court has any questions, I'd like to reserve the balance of my time. Thank you. Thank you. Good morning, Your Honors. Scott Ivey for Appellee. I'm going to take note of the questions and just jump right to what I see as the issues. I'm going to start with the misrepresentation claims, which are counts 1 and 3. I apologize. I don't remember who, but someone asked, what are the claims made? These have been shifting. And I think what's been missed in argument so far is what the misrepresentations were that the rest of these elements are judged on, including reliance. And here you have the primary one, the representations that the land bank will not take your house for personal property. If there's a guarantee, you don't have to worry because it's limited to the packing house. The only thing that can happen is the bank can take the packing house and nothing else. And that's not what the complaint says, which was filed after the discovery closed in support of those claims. What does the claim say? What does the complaint say? The complaint says, and I'm referring to Exit with the Record 284 and 288, because it's counts 1 and 3, the bank made the following misrepresentations, and I'm not quoting here, so please bear with me, that the docs they were signing would in no way obligate them as personal guarantees of any loan to ZM. Instead, the Margosians claimed they didn't know they were signing a guarantee, but were told they were signing a name change. That's what frames the pleadings. The pleadings frames the issue for summary judgment. That's what we moved upon. We addressed all the other issues, and I don't think it really matters, but I just wanted to frame that because now we're going to move in to the reliance issue. And the court also correctly noted River Island did away with Pendergrass, and Pendergrass you could get out if you just showed there was a conflict between the oral and the written. You can't do that anymore. The court maybe saw River Island coming or hedged its bet, but also addressed the reliance issue on Rosenthal. And in River Island, the bank raised this exact issue that we're here. Hey, okay, even if Pendergrass is overruled, there's no reasonable reliance here because they just could have looked at the document. And the court in footnote 11 of River Island directed them directly to Rosenthal. Well, so maybe we can say that there is a question of fact here. One maybe wouldn't otherwise think so. Just on the if true, if there really was, if the plaintiff's statements, defendant's actually, defendant's statements about what happened that day are true, that would be some indication that the bank thought that it needed to misrepresent something, and therefore, maybe that should be enough to say there is at least a question of fact about whether there was reasonable reliance. And the court did briefly address that, and I would direct response to your question saying it sounds like we're referring to circumstantial evidence of some motive, but I want to get back to the misrepresentations. We're assuming, as we must and as did the magistrate, that these representations were made. You're not signing a personal guarantee.  I'm starting from that premise. And we have to assume those are made. And then you have a guarantee titled, a huge guarantee, this explanation that Mr. Fruden was represented as a trainee. They got three letters, these are undisputed, saying these loans are distressed, signed Rob Fruden, Vice President. And they also now claim they have use of different names, so who knows? You may have. My point is the Rosenthal case, which I think controls after River Island, says they can't have acted in an objectively unreasonable manner. And it specifically walks through. If you have the opportunity to learn the true nature of the documents you signed and don't, that precludes the use of the fraud exception. And that survived River Island. Again, we have several documents to them, you're guaranteeing. They signed a counterproposal saying they're a guarantor. That's in the record. The restructure agreement says you're a guarantor. The loan agreements list them as guarantor. The guarantor they signed. And yet on what your statement, you're taking it as true that that day when they showed up at their home on a few minutes' notice, that they, you know, deceived them as to who they were or what they were doing and as to the purpose of it. The fact that their deception was totally successful should mean as a matter of law there was still not reasonable reliance because, given the situation, they nevertheless signed something that said guarantee. I wouldn't go that far, but I will. Well, you will. You are going that far. I have to because of the standard. I just didn't want that I'm accepting that those things were done or that the trial court. The magistrate had all the competing evidence. He said, yeah, those might be true. But you can say anything in any case if you don't meet reliance. That's why reliance is there. I mean, we can make up fanciful stories in every case. The reasonable reliance in the Supreme Court issue on this, they were presented with it in River Island in footnote 11 and specifically referred to Rosenthal and reaffirmed. If you could just look at this document. Just to deflect you a little bit, there's a second issue in this case, which is the duty to disclose specific findings as a to sureties, right? Correct. And this is what I wondered. It seemed to me that certainly with respect to the financial status of ZM, it would appear that there was no reason to disclose because the application is something that was unknown to the surety, and he purported to be the CFO of the company. But what about my understanding is that all of this, the real problem with ZM hinged on the financial status of ZS, the thing where Mr. Marcosin was not involved. I agree with half of that. The main issue or one of the issues is the financial status of ZNS. Say Mr. Marcosin was a co-owner and CFO of ZM. ZM was being funded along with his co-owner by ZNS. This is his 20-year business partner. They're funding Mr. Marcosin's million-dollar corporation, and he's the CFO. So turning directly to the financial status, and again, just very briefly referring again to the complaint filed after discovery closed, the facts are both ZNS and Zninovich are in severe financial trouble and or insolvent. As far as what we did disclose and had a duty to disclose, I think the magistrate judge was exactly correct. We told him these loans were distressed. We said we can't have new money, even if Zninovich and ZNS guarantee, because we're worried there's inadequate resources to repay. And I didn't see it in the magistrate's decision, but to me, the beginning and the end summa tomo is the first element is these facts were unknown to the Margosians. Again, the excerpts of the record at 286 is the complaint, tell you exactly what was concealed, and that is ZNS and Zninovich were both in severe financial trouble or insolvent. Mr. Margosian, the CFO and owner of ZM, stated that based upon all the information he had received, maybe some from us, he had been taking loans to Marty that hadn't been repaid. He stated he had some concerns as a financial status of Zninovich and ZS, yes. Based upon the information he had, he's even more specific. Prior to signing the guarantee, Mr. Margosian's had specific concerns that ZNS and Marty Zninovich were not solvent. I don't even, my issue is I don't even get to what the bank should have realized he knew when he knew these facts. Switching over to what the bank would do, this is an owner and a CFO, they would assume he weren't trying to hide anything. We sent letters to his home. It's undisputed he received them, saying these loans are distressed. They need to be ---- Kagan. Wasn't the ultimate downfall of ZNS, though, that the bank was refusing to, that their bank, different bank, was refusing to give them any more credit? No. And there's a parallel ---- But that is in the report, and there is no indication that Mr. Zarkarzi, that Mr. Margosian knew that. What the report says is more specific than that, but it says the member tells us Bank of the West isn't going to allow ZNS to fund ZMs through the line of credit anymore. And that report is the member, is the borrower, ZM. So what the bank is saying is ZM, be that Zninovich, Mr. Margosian, they're the ones who are telling us this. They're not going to be able to do that anymore. That's coexistence with what he already knew. They're possibly insolvent. They're not repaying loans. Again, it's not really what they knew on that second element. It's what the bank could reasonably assume they did know. And a bank trying to hide the financial problems that Mr. Margosian already knew about by sending letters, refusing new money specifically on the grounds, inadequate capital, you can't repay it, I don't care if it's guaranteed by Zninovich and ZNS. Mr. Margosian loaning money to Zninovich that hadn't been repaid that caused him concerns. I just can't get past the first element, which is the facts were unknown to the Margosians. Their complaint and the facts they admit they knew, all the facts I've given you are undisputed. They argue about them, but they're undisputed, and you apply them to the complaint. I think that's the end of Sumitomo. If we need to move on, there's some questions already been raised about what the bank had a reason to know. Again, that's how he's presenting himself. It's a multimillion-dollar operation. They disclosed everything they thought they needed to disclose. I would one would assume you have as good a knowledge as us about your business partner, co-owner, how your company's being funded. To presume otherwise, I think, is unreasonable, and I think that's the second ground the Court has. Kagan in the record for me. I'm sorry? One other mystery that was lurking in the record for me was why this restructuring was happening, and there was some suggestion that the main reason was because the line of credit, there was no collateral on the line of credit. And the and I couldn't really understand, but there was a personal guarantee originally on the line of credit, there was no collateral on the building? May I? I can separate them out. There was a term loan for construction. Right. I know that. $4 million and change. And there was a $1 million line of credit. The line of credit was supposed to be used for operations. This thing was supposed to be up and running, and then they switched over to the line of credit. And there was already the Marcosians already had a personal guarantee on both. Absolutely. They had guaranteed these exact loans that were restructured in 2007. That's undisputed. To respond to your question, the line of credit was used for to finish the building instead of operations. And that, again, in the record, Mr. Margosian admits he knew that. He was aware of it. I understand that. Okay. But what But did I respond to your question? No. Okay. Because I didn't get to ask it, actually. Sorry. And that is that the appellant's brief says a couple times that the reason the bank had a problem with the way it was set up originally was because there was some legal reason why they, without the collateral, would not be able to go after the Margosians or their partner on the personal guarantee. And I didn't understand that. Okay. As the original loans were made in 2007, the $4 million loan had the security of the property. The $1 million loan didn't. Didn't. Right. Okay. Okay. Moving forward, the loans become distressed. There's worrying about repayment. So we have a loan narrative that says, you know, in effect, why would we restructure these? You know, we're already saying these are distressed. They don't meet the underwriting requirements. And the answer was because the money's already out there. And this will collateralize the line of credit onto the property. By getting. Combine them into one loan. As. Secured by the land. Had nothing to do with the Margosians. But why did that matter? That's what I didn't understand. It mattered because as far as the Margosians, it didn't. They had already guaranteed the line of credit. Why it mattered to the bank is, before the restructure, we have a $4 million loan secured by the property, which we thought was worth $7 million plus. We have an expended line of credit that's not secured by anything but the guarantors. By combining them into one land loan, the entire now $5 million would be secured by the property. That was the change. That was the reason they approved it. By the same property? Yes. Including their personal property? I mean, their house? As far as the guarantors, it would be the same as it was under the two loans. The guarantors had never put their personal property up as a collateral in either case. I didn't hear the first part of that. My understanding is the guarantee was always a personal guarantee. It was not a lien or other encumbrance of particular personal property. Right. Not the personal property. It was an unconditional, continuing guarantee of all real property, all of their assets. There wasn't a UCC filing with personal property. But in 2007 or their real property or their home. That would be included under an unconditional guarantee. All of your assets are pledged in both 2007 and 2008. Nothing changed. That's the purpose of the guarantee, is to have as many sources of repayment. But it didn't include that million dollars. I'm sorry? It didn't include the extra or it didn't include the operating capital? It did. They guaranteed both loans separately in 2007. But what's the difference? What did change? Nothing as far as the Margozians, except that the 1 million, in addition to being guaranteed by them, which it already was, was now secured by the property, which clearly we would want to go after first. But they also suggested, and this is what I didn't understand, that without the collateralization of the property for purposes of the line of credit, that they couldn't they could not have been personally sued. And I don't know why that is. I don't, either. Okay. It's undisputed. They signed the same guarantee in 2007. It's undisputed. But because they seem to be saying that that guarantee wouldn't have been any good. And that was part of the motive. I haven't seen anything on the record to explain that. That was really what my question was directed at. Okay. Thank you very much. May I, just because I had so much on the punitive damages, I have 30 seconds? Okay. Go ahead. The issue we raise is the Sparkman and a line of other cases that all relied on Missouri v. Alt. And there's a suggestion that Myers in 1994 somehow overruled Alt in all these cases that had relied on it in finding a sue-and-be-sued clause does not waive entitlement to punitive damages. There's been no finding. All of the cases we cite, starting with Alt, going through the 9th, 6th, 11th, are all dealing specifically with application of the sue-and-be-sued clause. Does it waive the immunity for punitive damages? Every single one of them says no. Myers made some blanket statements, but they're aware of Alt. They're aware of these cases. They had nothing to do with punitive damages. Their argument, as I understand it, is that Myers overruled its own precedent and all of these circuits that had followed it impliedly. And I just don't see that. And I think we filed it based upon the law. The law was clear. I'm sorry if I cut you off. Do you have a question? Okay. Thank you very much. Thank you. Thank you, Your Honor. If I can clarify the Court's last question first on the issue of the million-dollar line of credit. The Margosians had valid defenses of that million-dollar line of credit, which they waived in three places, I believe, or at least two in the restructure agreement and the new loan agreement, defenses that they weren't aware of at the time, defenses that were never disclosed to them. The million-dollar line of credit was supposed to be a revolving line of credit for operations of ZM. It was supposed to be secured by accounts receivable of ZM. It was supposed to be evidenced by what are called borrowing-based certificates signed by an officer of the bank. None of that happened. They were authorized by a former, now currently former employee of the bank by the name of Pally Knock, who was involved in the original loans to ZM at the direction of Martins and Inovich. None of the loans were secured by receivables because there weren't any at the time. None of the loans had borrowing-based certificates because there weren't any at the time. The land bank's officers who we've had depositions taken that are in the record testified that all of this was in violation of bank policy. None of it was disclosed to the Margosians. Well, but the Margosians had a piece of paper that said that they were supposed to submit certain documents in order to get the money, and they didn't do it. Right. They didn't do it. But they're not the ones that made the requests. And in the case of ZM, they're not the ones that made the requests. Who made the requests? Martins and Inovich. The President and the other shareholder of ZM is the one that made the requests. To a bank officer who was supposed to be the CFO of this company. So if the requests are being made by the company, which I presume was what's happening, then he's ignorance doesn't seem to be of claims that are being made with that regarding the arrangement. It seems he has his own culpability there. Well, the bank officer also testified that Ms. Nock had no authority to grant the releases of the line of credit, even though she did. That was never disclosed to us. It was never disclosed to Margosians. The credit analysis report authored by Rob Pruden, the same Rob Pruden that goes out to the Margosians' home, details the purpose of this restructure. And the only reason for it is to protect the bank. It says it's in response to an oral request for a $5 million loan. How many banks consider oral requests for $5 million loans? The restructure was a pretext to protect the bank. The information in the car was the magistrate judge saying found not to be the same. It was the pretext. It wasn't acknowledged, no? I mean, what the reason was, which was to get the collateralization, no? It was to protect the bank on the collateralization issue, yes. I mean, did anybody ever tell the Margosians anything else about why they were restructuring? Why were they restructuring? They didn't tell them that that was the purpose for it. They told them they were just taking, putting two loans into one. That's what the purpose for it was. But they were aware that the bank considered the property under collateralized or compromised or something? The written letters that counsel is referring to said that the loans were considered distressed, even though they were not then in default, distressed. That's the only written documentation that the Margosians got on the issue of that. If I can move on to discussion of the reliance element, counsel talks about the Rosenthal case. The Rosenthal case was a one-page client agreement with an arbitration provision in bold print in the center of it. When those documents were signed, there were no pre-existing relationship between the bank and its customers. In this case, there was. Under Sumitomo, the Margosians were owed a duty of continuous good faith and fair dealing from the bank. Going back to 2007, that creates a heightened degree of responsibility for the bank to communicate this item, these items to the Margosians, which did not happen in this case. A case much more analogous with regard to the issues of justifiable reliance is a case that I cited. It's not in the briefs because it came down after. It's the Julius Castle Restaurant v. Payne case, which is at First Appellate District, California, 216, Calap, 4th, 1423. And I went over the ---- Kagan. I'm sorry. 216. Is this ---- Did you send a 28-J letter on this? I'm sorry, ma'am. Did you send us a 28-J letter on this case? No, because this came down in 2013. I know. That's what the 28-J letters are for. I apologize. I did not. So would you please give the court clerk a written piece of paper with the citation? I will do that. I will do that. And also briefly, Your Honor, in the Alliance mortgage case, which is cited in the brief, which is a California Supreme Court case, it said that only in the rare case where the undisputed facts leave no room for reasonable difference of opinion is the question of whether a plaintiff's reliance is reasonable a question of fact. We would submit that that's not the case here, because we are on summary judgment. Okay. Thank you both very much. Thank you. It's a very complicated and interesting case. The case of Fresno Madera, Federal Land Bank v. Margozian is submitted. And we are up to the last case of the day, Chapman v. Pier 1 in Paris.
judges: Bucklo, Berzon, Rawlinson